# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CIRCLE GROUP HOLDINGS, INC.,     )
                                     )
                   Plaintiff,        )
                                     )     Case No.  05 C 3921
      v.                                 )
                                     )     Judge Virginia M. Kendall
NURIEEL AKHAMZADEH and FARHAD    )
ZAGHI, individuals,            )

Defendants.   )
_____)

NURIEEL AKHAMZADEH,     )
                                     )
                Counter-Plaintiff,   )
      v.                                 )
                                   )
CIRCLE GROUP HOLDINGS, INC., DANA L.  )
DABNEY, GREGORY J. HALPERN,   )
EDWARD L. HALPERN, STANFORD J.   )
LEVIN, ALAN G. ORLOWSKY, STEVE H.  )
SALGAN and MIKE J. THERIAULT,   )
                                   )
                Counter-Defendants.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff/Counter-Defendants Circle Group Holdings, Inc. ("Circle Group") and Circle Group Officers and Directors Dana L. Dabney ("Dabney"), Gregory J. Halpern ("Halpern"), Edward L. Halpern ("Edward Halpern"), Stanford J. Levin ("Levin"), Alan G. Orlowsky ("Orlowsky"), Steve H. Salgan ("Salgan"), and Michael J. Theriault ("Theriault") (collectively, "Counter-Defendants") bring this joint motion to dismiss Defendant/Counter-Plaintiff Nurieel Akhamzadeh's ("Akhamzadeh" or "Counter-Plaintiff") affirmative defenses and amended counterclaims. In its Complaint, Circle Group alleges that Akhamzadeh executed a promissory note in exchange for

Circle Group stock and that he still owes money under the note. Akhamzadeh raises the affirmative defenses of fraud, illegality, and violation of California's Blue Sky Law to Circle Group's claim. He also asserts counterclaims against Circle Group for common law fraud, statutory fraud and breach of contract; against Halpern, the Chairman of the Board and Chief Executive Officer of Circle Group, for fraud; and against the other directors and officers of Circle Group for fraud.

Counter-Defendants initially move to dismiss all of Akhamzadeh's counterclaims under the doctrines of *in pari delicto* and unclean hands. If the counterclaims survive, Counter-Defendants argue that rescission is not a remedy available to satisfy them. Counter-Defendants also move to dismiss any affirmative defense or counterclaim not based on Illinois law. Last, Counter-Defendants move to dismiss many of the counterclaims and affirmative defenses for failure to plead fraud with particularity under Rule 9(b) and failure to state a claim under Rule 12(b)(6).

Counter-Defendants' Motion to Dismiss is granted in part and denied in part. Akhamzadeh's affirmative defenses and counterclaims based on California law are stricken or dismissed. Count V of Akhamzadeh's counterclaims is dismissed as against Theriault, Edward Halpern, Levin, Orlowsky and Salgan. Counter-Defendants' Motion to Dismiss is denied as to the remaining affirmative defenses, and as to the counterclaims against Circle Group, Halpern and Dabney.

### Counter-Plaintiff's Allegations

Circle Group Holdings, Inc. – formerly Circle Group Entertainment Ltd. and Circle Group Internet, Inc. – is in the business of food distribution. (Countercl. ¶¶ 2, 19). Circle Group manufactures and distributes Z-Trim through one of its subsidiaries, FiberGel Technologies, Inc. (Countercl. ¶ 19). Z-Trim is a zero calorie fat substitute used in processed foods. (*Id.*)

Co-Defendant Farhad Zaghi ("Zaghi") is an agent of Akhamzadeh. (Countercl. ¶ 42). In

1999, Circle Group placed Zaghi on its email list when he purchased Circle Group stock. (Countercl. ¶ 28). Through the email list, Zaghi received frequent emails from Circle Group, specifically from Circle Group Chief Executive Officer Gregory Halpern. (*Id.*) The emails contained information concerning Circle Group's business endeavors, including information that supposedly had not been announced to the public. (Countercl. ¶ 29). The contents of the emails caused both current and new investors to buy stock in the company, which led to an increase in the price of Circle Group stock. (Countercl. ¶ 30). Failing to profit from its business endeavors, the company subsisted solely on the revenue from the sale of its stock. (Countercl. ¶ 23). Halpern, through a series of misrepresentations, induced Akhamzadeh to purchase Circle Group stock. (Countercl. ¶ 22). The other directors and officers of the company knew or had reason to know that Halpern misrepresented the status of the business in order to induce investors such as Akhamzadeh to purchase Circle Group stock. (Countercl. ¶ 24).

During the summer of 2003, Akhamzadeh entered into three option agreements with Circle Group. (Countercl. ¶ 138). Under the first option agreement, dated July 2, 2003, Akhamzadeh was entitled to purchase 225,000 shares of Circle Group stock at a price of $1.00 per share. (Countercl. ¶ 139). Before entering into the agreement, Halpern represented to Akhamzadeh through Zaghi that the stock purchased under the option agreements would be freely transferable. (*Id.*) The second and third option agreements have an exercise date of December 31, 2006 at a price of $1.70 per share. (Countercl. ¶ 140). The second option agreement, dated July 10, 2003, permitted Akhamzadeh to purchase 300,000 shares with an option premium of $90,000 to be paid on or before December 27, 2006. (*Id.*) The third option agreement, dated July 15, 2003, entitled Akhamzadeh to buy 250,000 shares of with an option premium of $75,000 to be paid on or before December 27, 2006. (*Id.*) On

March 28, 2004, Akhamzadeh exercised the first option. (Countercl. ¶ 142). After he received the shares, Akhamzadeh communicated to Halpern that the shares were not issued solely to him and were restricted and not freely transferable. (Countercl. ¶ 144). Circle Group reissued the stock in Akhamzadeh's name only, but the shares remained restricted. (*Id.*) Akhamzadeh did not exercise the remaining two options because he could not immediately sell the shares purchased under the first option agreement and was told that any securities obtained through the second and third option agreement also would be restricted. (Countercl. ¶ 144-46).

On January 15, 2004, Circle Group issued a press release announcing an agreement for the Nestlé Company to purchase Z-Trim for use in its products. (Countercl. ¶ 31). After disclosing the Nestlé contract, Halpern gave a television interview during which he stated that Circle Group's stock would generate net profits of $.20 per share for the 2004 year. (Countercl. ¶ 32). Akhamzadeh and Zaghi were both aware of the television interview, and Zaghi watched portions of it on Circle Group's website. (Countercl. ¶ 33). Circle Group ended up operating at a net loss of $4,185,315 on the year – a loss of $.11 per share. (*Id.*) Circle Group's stock price nevertheless rose from $2.00 per share to $8.75 per share. (*Id.*)

A copy of Circle Group's business plan sent to Zaghi and shared with Akhamzadeh on or about March 15, 2004 stated that FiberGel entered into a long-term contract with Nestlé to supply Nestlé with Z-Trim. (Countercl. ¶ 34). Around the time Zaghi received the Circle Group business plan, he had discussions with Halpern over the telephone and through email concerning the future of the company. (Countercl. ¶ 35). During those communications, Halpern represented to Zaghi that Circle Group had multiple existing contracts to supply major corporations, including Nestlé, with Z-Trim and that the Z-Trim manufacturing plant, under construction, was nearing completion in July

of 2004. (*Id.*) Halpern further stated that the completion of the plant assured Circle Group's financial success and that "its stock price would increase dramatically . . . ." (*Id.*) Zaghi shared Halpern's statements with Akhamzadeh. (*Id.*) Also, before March 16, 2004, Halpern told Zaghi (who again shared the information with Akhamzadeh) that "the price of the Circle Group stock would soon reach $10.00 per share and would be trading at $20.00 per share at the end of 2004 . . . ." (Countercl. ¶ 36). Halpern knew his statements and his analysis of the market were false, as did the other Circle Group officers and directors. (*Id.*)

On March 11, 2004, George Turner, Vice President of Purchasing for the Nestlé Hand Held Foods Group, discussed the Nestlé-Circle Group relationship with Halpern. (Countercl. ¶ 37). Turner reminded Halpern that he had signed a confidentiality agreement which prohibited Halpern from publically discussing the Nestlé contract. (*Id.*) In a letter sent from Turner to Halpern acknowledging the March 11 conversation, Turner stated that the contract between Nestlé and Circle Group was for one year and was terminable at will by Nestlé. (*Id.*)

On March 25, Zaghi's brother, Farshad Zaghi,[1] and Akhamzadeh purchased shares of Circle Group stock for $450,000 and $50,000 respectively. (Countercl. ¶ 39). The previous day, Halpern sent an email to its investors, including Zaghi, regarding Circle Group's new manufacturing plant: "[t]his 22,000 sq. ft. plant is located adjacent to our executive offices in Mundelein, Illinois and will be operational by July 2004. We will be able to produce up to 1 million pounds of Z-Trim and 13 million gallons of Z-Bind." (Countercl. ¶ 40). Circle Group's March 31, 2004, 10-QSB filing with the SEC reflected the March 24, 2004 email to investors. (Countercl. ¶ 41). At the time Halpern

---

[1] Farshad Zaghi is a plaintiff in a related case that has been consolidated with this action, 05 C 7214. In the related case, Farshad Zaghi brings claims against Circle Group and its officers and directors similar to Akhamzadeh's counterclaims.

made the statement concerning the plant's completion, he knew or had no reasonable basis to believe that the plant would be operational by July 2004. (*Id.*)

In May of 2004, Akhamzadeh, through Zaghi, purchased 453,333 shares of Circle Group stock. (Countercl. ¶ 42). Akhamzadeh paid for the 453,333 shares of stock with a $2,040,000 full recourse promissory note. Under the terms of the note, Akhamzadeh paid $4.50 per share of stock and payment on the note was due on or before June 30, 2004. (*Id.*) Later, a second full recourse promissory note amended the first promissory note, making payment due on or before September 30, 2004. (*Id.*) Halpern offered the September 30 extension in response to Akhamzadeh's concern that the 453,333 shares had not been registered by the end of June 2004. (Countercl. ¶ 52). Before agreeing to the September extension, Zaghi, on behalf of Akhamzadeh, discussed the status and future of the company with Circle Group representatives, including Halpern. (Countercl. ¶ 43). During these conversations, Halpern made several misrepresentations concerning the Nestlé-Circle Group relationship and the anticipated completion of the processing plant:

> (a) Circle Group's subsidiary FiberGel was making a product, Z-Trim, that was already in high demand, that was generating profits and that was going to be highly profitable as time went on; (b) completion of construction of Circle Group's new Z-Trim plant was almost complete and would allow production to increase to meet exploding demand; (c) Circle Group's stock price would leap once the plant opened in July of 2004, because ever increasing large orders from large buyers of the product like Nestlé could be fulfilled; (d) Nestlé was increasing its orders for Z-Trim; and (e) Circle Group's profits would soar once the plant opened and the expanded Nestlé contract was serviced.

(*Id.*) These statements made by Halpern and other Circle Group representatives were untruthful and intended to fraudulently induce Akhamzadeh to retain his stock. In fact, the plant was not on schedule, would not be able to meet the requirements of the Nestlé contract once it was completed, and was over budget. (Countercl. ¶ 44). Akhamzadeh would not have purchased the Circle Group

stock in accordance with the promissory note had he known Halpern's statements were untruthful. (*Id.*)

Circle Group's quarterly filings in May 12, 2004, listed the contract between Nestlé and Circle Group for Z-Trim. (Countercl. ¶ 45). The next day, Circle Group announced that Nestlé had agreed to increase its Z-Trim order to 215,000 pounds over the period of May 2004 to December 2004. (*Id.*) A Circle Group email sent to investors on May 21, 2004, stated:

> "[t]hings are very busy here. We are making Z-Trim as fast as we can trying to keep up with the ever increasing orders and requests. This is an exciting time as we move Z-Trim from a product concept to the manufacturing phase. Our plant is moving ahead as scheduled. It should be quite far along by the time we have our shareholders meeting on June 16 . . . We had an increase in our order from Nestlé."

(*Id.*) In May 2004, though Circle Group contractually was obligated to ship 7,500 pounds of Z-Trim to Nestlé, it shipped only 3,100 pounds. (Countercl. ¶ 47). In June 2004, though obligated to ship 12,000 pounds of Z-Trim to Nestlé, Circle Group delivered less that 3,500 pounds. (Countercl. ¶¶ 47-48).

On June 30, 2004, in response to Akhamzadeh's and Zaghi's concerns over the 453,333 unregistered shares of stock, Circle Group agreed to extend the payment date of the promissory note to December 31, 2004. (Countercl. ¶ 53). Circle Group's letter to Akhamzadeh acknowledging the December 31 extension also recognized Akhamzadeh's right to cancel the promissory note if he returned the shares. (*Id.*) During this time, Halpern wrote to Circle Group's shareholders that the Mundelein plant was "very close" to completion and that the facility "will give us the ability to deliver existing orders and ramp up sales this summer . . . ." (Countercl. ¶ 55). Halpern knew his statements were false when he made them. (*Id.*)

On July 7, 2004, Turner terminated Nestlé's relationship with Circle Group in a certified

letter sent to Halpern. Though Halpern refused service of the letter, he knew its contents because a telecopy of the letter was sent to him. (Countercl. ¶ 56). The Circle Group officers and directors also knew that the Nestlé contract had been canceled. (Countercl. ¶ 58). Halpern, Dabney, and Theriault, who all were aware that the Nestlé contract had been canceled, sold Circle Group stock before the company publically announced an end to the Nestlé-Circle Group relationship. (Countercl. ¶ 59). Dabney sold 64,000 shares, Theriault sold 50,000 shares and Halpern sold 84,000 shares of his Circle Group stock. (*Id.*) Certain other investors were told about the termination of the Nestlé contract before the public announcement, which led to a further decrease in the stock's value. (Countercl. ¶ 60).

On August 6, 2004, Circle Group registered Akhamzadeh's 453,333 shares of stock but still had not disclosed the termination of the Nestlé contract. (Countercl. ¶ 67). Filed ten days later, Circle Group's 10Q quarterly report for the second quarter of 2004 did not acknowledge the Nestlé termination. (Countercl. ¶ 68). On August 25, 2004, Circle Group held a ribbon-cutting ceremony for the Mundelein plant even though plant construction was not complete. (Countercl. ¶ 69). The next day a website publically reported the cancellation of the Nestlé contract. (Countercl. ¶ 70). When Zaghi confronted Halpern with the website report, Halpern denied that the Nestlé contract had been terminated and threatened to sue the website owner. (Countercl. ¶ 71). Later that month, Halpern contacted Zaghi and explained that Circle Group needed a cash infusion. (Countercl. ¶ 72). Halpern suggested that Zaghi purchase more stock or else additional shares would be sold on the open market, thus decreasing the value of Akhamzadeh's investment. (*Id.*)

On September 23, 2004, Halpern sent Zaghi an email informing Zaghi that the board of directors had voted to extend the promissory notes' payment date to September 30, 2005.

(Countercl. ¶ 74).  On October 6, 2004, the Dow Jones News Service published a story that "Swiss food giant Nestlé SA (NESN.VX) has stopped using Circle Group Holdings, Inc.'s (CXN) zero-calorie fat substitute called Z-Trim."  (Countercl. ¶ 76).  Two days later, Circle Group issued a press release acknowledging that the Mundelein plant's "production capacity was not satisfactory to meet the increased demand" and that Circle Group was no longer shipping Z-Trim to Nestlé.  (Countercl. ¶ 78).  On October 15, 2004, Circle Group officially announced the end of its relationship with Nestlé.  (Countercl. ¶ 81).  Halpern told Zaghi that he was not concerned with the loss of the Nestlé contract because Circle Group had other imminent business opportunities: "(1) contracts with Albertson's stores to stock Z-Trim salad dressing; (2) contracts with Senticor and Pacific Lumber for another Circle Group product called Z-Bind; (3) potential contracts with Smith, General Dynamics, and Philips for yet another Circle Group product, ThraxVac, (4) discussions with Oral B regarding a fourth project and (5) contracts with McDonald's, Pizza Hut and a meat factory for Z-Trim."  (*Id.*)  The Nestlé announcement came one week after Zaghi purchased 1,000,000 additional shares at $.90 per share.  (Countercl. ¶ 82).

On October 29, 2004, Dabney sent Akhamzadeh a letter that Circle Group claimed to represent the June 30, 2004 extension of the payment date on the note.  (Countercl. ¶ 86).  However, the new letter, bearing the date June 30, 2004, differed from the original version.  Specifically, it now provided Akhamzadeh a place to sign his name, it did not contain language indicating Akhamzadeh's right to tender his shares back to Circle Group, and it included an 4.25% per annum interest provision.  (Countercl. ¶ 86).  Halpern explained to Zaghi that the new June 30, 2004 letter was "only for the benefit of the SEC and for purposes of regulatory compliance."  (Countercl. ¶ 91).

From the end of 2004 into early 2005, Halpern represented that "Circle Group was just weeks

away from announcing a multimillion dollar deal . . . ." (Countercl. ¶ 92). Additionally, Halpern claimed that Circle Group would soon be "announcing at least 8 major contracts with purchasers of its products in December 2004." (*Id.*) Due to these rumored contracts, which did not exist, Circle Group's stock price rose to $2.22 by the end of 2004. (*Id.*) In December of 2004, Zaghi informed Halpern that Akhamzadeh intended to tender the 453,333 shares he had obtained in exchange for the promissory note. (Countercl. ¶ 94). Halpern attempted to dissuade Akhamzadeh from returning the 453,333 shares with a new proposal: Akhamzadeh would waive his right to return the 453,333 shares in exchange for an additional 2.25 million shares of Circle Group stock and warrants for an additional 275,999 shares. (Countercl. ¶¶ 95-96). The value of the 2.25 million shares combined with the market value of the 453,333 shares was approximately equal to the remaining balance on the promissory note. (Countercl. ¶ 97). The plan called for Akhamzadeh to sell the original 453,333 shares in order to begin paying back Circle Group under the terms of the new agreement. (*Id.*) Halpern told Zaghi that Akhamzadeh needed to ascend to the terms of the new agreement or else endanger the company and the other investments of Zaghi, Farshad Zaghi, and Akhamzadeh. (*Id.*)

Halpern stated that he could not sell the additional shares directly to Akhamzadeh because Circle Group's accountant and attorney might object given the outstanding promissory note. (Countercl. ¶ 98). Halpern also did not want to sell the stock to Zaghi who, as a resident of the United States, would be subject to a more difficult registration process. (*Id.*) Thus, Halpern suggested the 2.25 million shares be sold to two Israeli men under a consulting agreement. (*Id.*) The two men would not be required to provide actual consulting services to Circle Group – they would be straw men in a sham consulting transaction. (*Id.*) The Israeli men then could transfer the securities to Akhamzadeh. (*Id.*) Akhamzadeh agreed to the consulting agreement plan, which was

10

initiated. (Countercl. ¶¶ 100, 105). The 2.25 million shares, however, never were registered. (Countercl. ¶ 105). From the end of 2004 through March of 2005, Akhamzadeh issued a series of payments to Circle Group. (Countercl. ¶ 108-10). One such payment, a check in the amount of $325,000, bounced. Circle Group then filed this instant action against Akhamzadeh for the remaining balance on the note and against Zaghi for his intentional interference with the contract between Circle Group and Akhamzadeh.

Akhamzadeh asserts four affirmative defenses to Circle Group's claim against him for enforcement of the note. First, Akhamzadeh alleges that Circle Group fraudulently induced him to retain his shares of Circle Group stock in December of 2004. Second, Akhamzadeh argues that Circle Group fraudulently induced him into buying its stock in May of 2004. Third, Akhamzadeh contends that Circle Group's sale of stock to him violated Section 5 of the 1933 Securities Act. And, fourth, he asserts that Circle Group's sale of securities to him violated California's Blue Sky Law.

Akhamzadeh also asserts five counterclaims. Count I alleges common law fraud against Circle Group relating to Akhamzadeh's purchase and retention of the company's securities. Count II makes similar allegations under California Civil Code § 1709, the state's statutory fraud provision. Count III alleges that Circle Group breached its contract with Akhamzadeh when it failed to register the 2.25 million shares Akhamzadeh purchased. Count IV alleges that Halpern defrauded Akhamzadeh and breached his contract by negotiating three option agreements for stock that was supposed to be freely tradeable but was not. Count V alleges fraud on the part of Circle Group's officers and directors for failing to correct the fraudulent representations made by Halpern.

## ANALYSIS

A court should strike an affirmative defense from the pleadings under Rule 12(f) if the

defense is insufficient or immaterial.[2]  *See Heller Financial v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989); *Bobbitt v. Victorian House, Inc.*, 532 F. Supp. 734 (N.D. Ill. 1982) (outlining three-part test for analyzing sufficiency of an affirmative defense).  A court considers a counterclaim under the familiar Rule 12(b)(6) standard just as if it were brought as a claim in a plaintiff's complaint.  *See Cozzi Iron and Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001).  Thus, when considering a motion to dismiss a counterclaim or to strike an affirmative defense, a court must take as true all facts alleged in the counterclaim or defense and construe all reasonable inferences in favor of the counter-plaintiff/defendant.  *See Fried Trading Co. v. Austern*, 1987 WL 4773, *1 (N.D. Ill. 1987) ("[T]he court must accept as true the well-pleaded facts of the counterclaim and the affirmative defenses").  A motion to dismiss a counterclaim or to strike an affirmative defense will not be granted "unless it appears beyond doubt that the [counter-plaintiff/defendant] can prove no set of facts in support of his claims which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see Williams v. Jade Fuel Company, Inc.*, 944 F.2d 1388, 1400 (7th Cir. 1991) (a motion to strike affirmative defenses will not be granted "unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense and are inferable from the pleadings").

## I.      General Challenges to Counterclaims and Affirmative Defenses

Counter-Defendants raise several challenges that apply to each or most of Akhamzadeh's affirmative defenses and counterclaims: (1) the affirmative defenses of *in pari delicto* and unclean

---

[2] "Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).

hands, (2) that rescission is not a proper remedy, and (3) that California law does not apply to the events alleged in this case. As set forth below, because a set of facts exists under which Akhamzadeh could prevail on his counterclaims despite any role he had in the sham consulting transaction, dismissal of those counterclaims on the grounds of *in pari delicto* and unclean hands is improper. Likewise, a set of facts exists under which rescission may be a proper remedy. Finally, since no party has demonstrated that the forum state's law conflicts with any other potentially applicable state's law, Illinois law applies to the claims and defenses in this case.

## A.     *In Pari Delicto* **and Unclean Hands**

The doctrines of *in pari delicto* and unclean hands are affirmative defenses. *See Knauer v. Jonathon Roberts Financial Group, Inc.*, 348 F.3d 230, 237 n. 6 (7th Cir. 2003); *Scheiber v. Dolby Laboratories, Inc.*, 293 F.3d 1014, 1021 (7th Cir. 2002) ("[U]nclean hands can be asserted in opposition to an equitable defense as well as being assertible as a defense to a claim for equitable relief"). Typically, it is not proper to dismiss a claim based on an affirmative defense at the motion to dismiss stage. *See Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir.2003) (holding that a plaintiff need not try to plead around affirmative defenses); *Deckard v. General Motors Corp.*, 307 F.3d 556, 560 (7th Cir. 2002) ("The existence of a defense does not undercut the adequacy of the claim"). An exception to this rule exists only where the face of the complaint shows beyond doubt that an affirmative defense is dispositive. *See Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) (approving dismissal "when the existence of a valid affirmative defense is so plain from the face of the complaint that the suit can be regarded as frivolous").

## 1.     *In Pari Delicto*

The common-law defense of *in pari delicto* derives from the Latin phrase, *in pari delicto*

*potior est conditio defendentis*, or "[i]n a case of equal or mutual fault . . . the position of the [defending party] . . . is the better one." *Eichler v. Berner*, 472 U.S. 299, 306 (1985), quoting Black's Law Dictionary 711 (5th ed. 1979). The doctrine of *in pari delicto* "is intended for situations in which the victim is a participant in the misconduct giving rise to his claim." *Williams Electronic Games, Inc. v. Garrity*, 366 F.3d 569, 573-74 (7th Cir. 2004). A classic example of *in pari delicto* is the "case of the highwayman who sued his partner for an accounting of the profits of the robbery they had committed together." *Id.*

In December of 2004, Akhamzadeh and Circle Group entered into an agreement under which Akhamzadeh would purchase an additional 2.25 million shares of Circle Group stock. In turn, Akhamzadeh agreed not to return the shares he had purchased previously under a promissory note. Akhamzadeh alleges that Halpern did not want to sell the additional securities to him directly because Circle Group's accountant and attorney would object. Therefore, Circle Group and two other individuals chosen by Akhamzadeh ("the consultants") forged a sham consulting agreement. Circle Group gave the stock to the consultants, who then transferred it to Akhamzadeh. The two individuals never provided Circle Group with any consulting services. Counter-Defendants contend that Akhamzadeh's counterclaims should be barred because of his participation in the sham consulting agreement.

Although some courts have used *in pari delicto* to bar a claim when plaintiffs engage in "the same sort of wrongdoing" as defendants, *Eichler,* 472 U.S. at 307, traditionally, the doctrine is only applicable "to situations where the plaintiff truly bore at least substantially equal responsibility for his injury, because 'in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees

in their guilt.'" *Id.* In *Eichler*, the Court refused to apply *in pari delicto* to the claims of investors who had purchased securities based on what they thought was insider trading information. *Id.* at 314 ("Absent other culpable actions by a tippee that can fairly be said to outweigh these violations by insiders and broker-dealers, we do not believe that the tippee properly can be characterized as being of substantially equal culpability as his tippers"). Thus, *in pari delicto* does not bar a party's cause of action based solely on participation in an illegal or fraudulent scheme. *See Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134 138-39 (1968) ("[T]he doctrine should not 'deny recovery to injured parties *merely because they have participated* to the extent of utilizing illegal arrangements formulated and carried out by others'").

Whether parties to an illegal or fraudulent agreement are equally at fault is a challenging factual question. *See Premier Electrical Construction Co. v. Miller-Davis Co.*, 422 F.2d 1132, 1138 (7th Cir. 1970) ("Many factors are, therefore, relevant in determining whether participation by the plaintiff in an illegal agreement constitutes a defense to his treble damage action"). Akhamzadeh alleges that Halpern conceived the sham consulting agreement as a means of preventing Akhamzadeh from returning the shares of stock purchased under the promissory note. Akhamzadeh participated in the scheme, he alleges, only to facilitate the transfer of stock. The consulting agreement was Halpern's idea and principally for his and Circle Group's benefit. Based on Akhamzadeh's allegations, a set of facts may exist under which Akhamzadeh does not bare substantially equal responsibility to Circle Group and Halpern. *See Eichler,* 472 U.S. at 314 ("There is certainly no basis for concluding at this stage of this litigation that the respondents were *in pari delicto* with [defendants]"). Therefore, at this stage, Counter-Defendants' motion to dismiss Akhamzadeh's counterclaims based on *in pari delicto* is denied.

## 2.    Unclean Hands

Unclean hands bars equitable relief if such relief would result in a wrongful gain for the plaintiff.  *See Scheiber*, 293 F.3d at 1021 ("'[U]nclean hands' really just means that in equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to").  Akhamzadeh admits his participation in an agreement with Circle Group, allegedly arranged by Halpern, whereby stock was sold to two "consultants" though there was no expectation that the two consultants would perform any consulting work.  To the extent that Akhamzadeh seeks equitable relief, his conduct will be relevant in determining whether he would gain wrongfully from his conduct.  At the motion to dismiss stage, however, it is not clear whether Akhamzadeh's hands are "unclean" as a matter of law or how that fact should affect the remedy he is entitled to.  *See Walker*, 288 F.3d at 1009.

## B.    Rescission

Rescission is the unwinding of a contract in order to return the parties to their pre-contract positions.  *See Jones v. Infocure Corp.*, 310 F.3d 529, 535 (7th Cir. 2002) ("Rescission involves a judicial termination of a party's contractual obligations; it is a court-ordered "unwinding" of a contract . . .").  Rescission is possible only to the extent that the parties can return to the status quo. *Id.*  Perhaps, equity would require Akhamzadeh to return the shares and Circle Group to refund his payments and cancel his promissory note.  On the other hand, the change in Circle Group's stock price and its financial position may preclude such a solution.  Ultimately, it is impossible to determine whether rescission is appropriate, or even possible, based solely on Akhamzadeh's allegations.  Couched in terms of Rule 12(b)(6), because the Court cannot say beyond doubt that there is no set of facts under which the parties could not be returned to their pre-contract positions,

rescission remains a potential remedy for Akhamzadeh's counterclaims.

## C. Affirmative Defenses and Counterclaims Under California Law

Akhamzadeh's fourth affirmative defense and Count II of his counterclaims rely on California's Blue Sky Law and California's fraud statute for relief. A district court exercising diversity jurisdiction applies the choice-of-law rules of the state in which it sits. *See Ruiz v. Blentech Corp.*, 89 F.3d 320, 323 (7th Cir. 1996). Illinois' choice-of-law rules derive from the Restatement (Second) of Conflicts of Law, which employs a "significant relationship" analysis. *See Suzik v. Sea-Land Corporation*, 89 F.3d 345, 348 (7th Cir. 1996) ("These rules require that the court employ the substantive law of the state with the most significant relationship to the tort at issue"). While Akhamzadeh emphasizes California's relationship to this case, he misses the first step in the analysis – that is, before this Court may consider California's relationship to the events, Akhamzadeh must identify a conflict between Illinois and California law. *See Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998) ("A federal court should apply the law of the forum state where the parties have not identified a conflict between two bodies of state law which might apply to their case"). Because Akhamzadeh has not identified any conflict between Illinois' Blue Sky or fraud statutes and those of California, Illinois law governs this case. Consequently, to the extent that Akhamzadeh's counterclaims and affirmative defenses are grounded in California law, they are dismissed.

## II. Affirmative Defenses and Counterclaims Based on Fraud

Counter-Defendants move to dismiss, under Rules 9(b) and 12(b)(6), Akhamzadeh's affirmative defenses and counterclaims based on allegations of fraud. In addition to the need to state a claim under Rule 12(b)(6), Rule 9(b) requires that "[i]n all averments of fraud or mistake, the

circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

"While this does not require a plaintiff to plead facts that if true would show that the defendant's alleged misrepresentations were indeed false, it does not require the plaintiff to state 'identity of the person making the representation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). The heightened pleading therefore requires a complaint alleging fraud to contain more substance to survive a motion to dismiss as compared to a Rule 12(b)(6) motion based on another cause of action. *See Ackerman v. Nw. Mutual Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) (stating that Rule 9(b) forces "the plaintiff to do more than the usual investigation before filing his complaint"); *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (explaining that "[t]he rule is said to serve three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party"). An affirmative defense based on fraud likewise must satisfy the pleading requirements of Rule 9(b). *See Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 2005 WL 3021976, *2 (C.D. Ill. 2005). Each of Akhamzadeh's affirmative defenses and counterclaims satisfy the heightened pleading standard of Rule 9(b) and state a claim under Rule 12(b)(6).

## A.      Akhamzadeh's May 2004 Stock Purchase

Akhamzadeh alleges that Circle Group induced him, through a series of misrepresentations and omissions, to buy Circle Group stock in May of 2004. (Countercl. ¶¶ 22-23). Akhamzadeh alleges that these misrepresentations concerned the construction of the Z-Trim production plant, the

contract with Nestlé, and the expected profit and stock price of Circle Group based on its current contracts and projections.  (Countercl. ¶¶ 29-40, 43).

Counter-Defendants argue that Akhamzadeh's claims should be dismissed because he fails to plead reliance or that Zaghi conveyed certain information to him.  Initially, Akhamzadeh has alleged that Zaghi conveyed Circle Group's representations to him,  (Countercl. ¶¶ 33-36), and that he relied on those representations in executing the promissory note and purchasing the stock, (Countercl. ¶ 44).  Moreover, a complaint need not contain allegations demonstrating a plaintiff's reliance or the reasonableness of plaintiff's reliance. *See Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 524 (7th Cir. 1993) ("All Rule 9(b) required, however, was that [plaintiff] set forth the date and content of the statements or omissions that it claimed to be fraudulent. [Plaintiff] was not required to go further and allege the facts necessary to show that the alleged fraud was actionable"); *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) (holding that Rule 9(b) should not be read to broadly to require facts establishing each element of claim).  Akhamzadeh identified specifically many of Halpern's misrepresentations concerning Circle Group's financial condition and future as well as the dates the misrepresentations were made and how he received them.  (Countercl. ¶¶ 29-40, 43).  Akhamzadeh thus pleaded the "who, what, when, and where" of the alleged fraud sufficient to "reasonably notify the defendants of their purported role in the scheme." *Vicom*, 20 F.3d at 777; *DiLeo v. Ernest & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (stating that Rule 9(b) requires the "who, what, when, where and how: the first paragraph of any newspaper story").  Rule 9(b) demands no more.

Counter-Defendants also argue that Akhamzadeh's claims should be dismissed under Rule 12(b)(6)  because the alleged misrepresentations are non-actionable statements of future events and

expectations. *See Peterson Industries, Inc. v. Lake View Trust and Savings Bank*, 584 F.2d 166, 169 (7th Cir. 1978) (explaining that statements of opinion which relate to future or contingent events generally are not actionable as misrepresentations under Illinois law). Counter-Defendants characterize Halpern's statements as predictions or forecasts which are not subject to objective verification, and vague or non-specific rhetoric which merely promote the company. Of first note, to the extent that Halpern's statements regarding the Z-trim manufacturing plant or the Nestlé contract purported to represent current facts, they are actionable. *See Peterson v. Baloun*, 715 F. Supp. 212, 216 (N.D. Ill. 1989) (noting that tradition rule in Illinois permits recovery for misrepresentations concerning past or existing events but barring recovery for fraud based on promises relating to future events). Additionally, "predictions of future events and statements of opinion are actionable when part of a scheme to defraud." *General Motors Acceptance v. Central National Bank of Mattoon*, 773 F.2d 771, 780 (7th Cir. 1985); *see eOnline v. Chicago Consulting Partners*, 2002 WL 484865, *3 (N.D. Ill. 2002) ("[A]n exception to the general rule comes into play when the promise relating to the future event is used to perpetrate a fraud"). Akhamzadeh has alleged a scheme to defraud – Halpern knowingly misrepresented facts relating to the Z-Trim production plant, the contract with Nestlé, and Circle Group's financial position and prospects with the intent to induce investors to purchase Circle Group's stock. (Countercl. ¶¶ 22, 23, 29-40). Akhamzadeh, therefore, has stated a claim under Rule 12(b)(6) for fraud relating to his purchase of Circle Group stock in May 2004 in exchange for a promissory note.

**B.    Akhamzadeh's December 2004 Retention of Stock**

Akhamzadeh alleges Circle Group fraudulently induced him not to tender his shares back to the company in December 2004 for cancellation of the note. Akhamzadeh cites Halpern's

representations that "Circle Group was just weeks away from announcing a multimillion dollar deal . . . ." and would soon be "announcing at least 8 major contracts with purchasers of its products in December 2004," (Countercl. ¶ 92), as evidence that Circle Group falsely represented it financial situation when it knew that its December stock price was inflated artificially, (Countercl. ¶ 118). Akhamzadeh also alleges that Circle Group promised to extend the due date of the promissory note when it had no intention of actually issuing such extensions and that Halpern represented that the 2.25 million shares that Akhamzadeh received through the sham consulting agreement would be free-trading by March 10, 2005. (Countercl. ¶ 118). Akhamzadeh allegedly relied on these representations and they induced him to retain his stock. (Countercl. ¶ 121-22). These allegations of the "who, what, when, and where" of the alleged scheme to defraud him satisfy Rule 9(b) and are actionable under Rule 12(b)(6). *Vicom*, 20 F.3d at 777.

## C. The Option Agreements

In the summer of 2003, Akhamzadeh entered in three Option Agreements with Halpern, under which Akhamzadeh had the right to buy a certain number of Circle Group shares from Halpern at set prices, with the additional cost of an option premium to be paid to Halpern. (Countercl. ¶ 138). Akhamzadeh alleges that the first of three option agreement was dated July 2, 2003, and entitled him to purchase 225,000 shares of Circle Group stock at $1.00 per share. (Countercl. ¶ 139). Akhamzadeh contends that Halpern represented to Zaghi, who relayed to Akhamzadeh, that the securities purchased pursuant to the option agreement would be freely tradeable. (*Id.*) Akhamzadeh alleges that Halpern's statements beginning in 2004 concerning the strength of Circle Group's relationship with Nestlé, the company's profitability, and its prospects for future growth were intended to induce him to exercise the first option agreement, which he did on March 8, 2004.

(Countercl. ¶ 142). Akhamzadeh alleges that the shares were not issued in accordance with the agreement he and Halpern had reached – the securities were not issued solely in his name and the shares were restricted and not freely transferable. (Countercl. ¶ 144). Akhamzadeh alleges that he would not have exercised the first option agreement had he known the stock would not immediately be transferable. (Countercl. ¶ 152). Based on Halpern's statements that any shares purchased under the second and third option agreements would be restricted, he chose not to exercise the remaining option agreements. (Countercl. ¶ 144). Akhamzadeh's substantial allegations regarding the option agreements and Halpern's representations state with particularity the basis for Akhamzadeh's fraud claims and defenses. Accordingly, his claims satisfy Rule 9(b) and state a claim under Rule 12(b)(6).

### D.    Fraud Against Circle Group's Other Officers and Directors

Akhamzadeh alleges that the Circle Group officers and directors – Dabney, Theriault, Edward Halpern, Levin, Orlowsky, and Salgan – defrauded Akhamzadeh through a series of misrepresentations and omissions. (Countercl. ¶ 154.) Akhamzadeh pleads that the officers and directors had knowledge of Halpern's statements to Zaghi and Akhamzadeh but did nothing to correct the representations, which they knew to be false. (Countercl. ¶ 155.)

Under Illinois law, an officer and director is not liable based on knowledge alone. *See Itofca, Inc. v. Hellhake*, 8 F.3d 1202, 1205 (7th Cir. 1993) (stating that Illinois law requires "some degree of activity and active involvement" by the officer or director). "[A]n officer or director is only liable for his corporation's fraud if the officer or director 'with knowledge, or recklessly without it, *participates or assists in the fraud*.'" *See Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F. Supp.2d 1029, 1046 (N.D. Ill. 2003), quoting *Murphy v. Walters*, 87 Ill. App. 3d 415 (1980) (emphasis added); *see also People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 179-80 (1992).

22

Akhamzadeh alleges that Dabney attempted to coax Akhamzadeh into signing backdated subscription agreements and alter the terms of the promissory note on October 28, 2004, October 29, 2004, and November 2, 2004 as part of the scheme to defraud him. (Countercl. ¶ 84-86). Akhamzadeh alleges that the other Circle Group officers and directors participated in the alleged fraud "by omission, in that none of them set the record straight." (Countercl. ¶ 55). Such omission does not equal active participation and there are no other allegations from which a reasonable inference can be made that any of the other officers and directors participated or were actively involved in the fraud. Akhamzadeh also has not alleged that Theriault, Edward Halpern, Levin, Orlowsky or Salgan had any duty to "set the record straight." Generally speaking, "a corporation and its shareholders do not have the kind of fiduciary relationship which requires total disclosure," *Blanchard v. Edgemark Financial Corporation*, 2001 WL 587861, * 4 (N.D. Ill. 2001), and "parties to an impersonal market transaction owe no duty of disclosure absent a fiduciary or agency relationship, prior dealings or circumstances such that one party has placed trust and confidence in the other." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989). Absent a duty of disclosure, Theriault, Edward Halpern, Levin, Orlowsky and Salgan had no legal obligation to correct Halpern's misrepresentations. *See Stransky v. Cummins Engine Co. Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("Mere silence about even material information is not fraudulent absent a duty to speak").

Group pleading usually is not acceptable under Rule 9(b). *See Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) ("A complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient"). Akhamzadeh refers to Theriault, Edward Halpern, Levin, Orlowsky and Salgan collectively as "officers and directors" and rarely, if ever, by

name.  Group pleading is prohibited when it is used to ascribe conduct vaguely to a group of individuals in order to escape Rule 9(b)'s obligations to investigate pre-complaint or plead with particularity.  *See Ackerman v. Mutual Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).  Akhamzadeh's allegations that the "officers and directors" knew that Halpern was making false and misleading statements to investors is too vague to satisfy Rule 9(b).  For this reason and because they did not actively participate in the scheme to defraud Akhamzadeh, Counter-Defendants' Motion to Dismiss is granted with respect to Theriault, Edward Halpern, Levin, Orlowsky and Salgan.  Based on his attempts to get Akhamzadeh to sign backdated subscription agreements, Counter-Defendants' Motion to Dismiss is denied with respect to Dabney.

## Conclusion and Order

Wherefore, Counter-Defendants' Motion to Dismiss is granted in part and denied in part.  Akhamzadeh's affirmative defenses and counterclaims are stricken or dismissed to the extent they rely on California law.  Count V of Akhamzadeh's counterclaims, alleging fraud against Theriault, Edward Halpern, Levin, Orlowsky and Salgan, is dismissed as to these Counter-Defendants.  Counter-Defendants' Motion to Dismiss is denied as to the remaining affirmative defenses and counterclaims.  All affirmative defenses and counterclaims are stricken or dismissed without prejudice.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  September 1, 2006

24